# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

RAYMOND LOFSTAD and GUS
LOVGREN,

        Plaintiffs,

        v.

GINA RAIMONDO, in her official capacity
as Secretary of the United States Department
of Commerce; JANET COIT, in her official
capacity as Assistant Administrator of the
National Marine Fisheries Service; and
NATIONAL MARINE FISHERIES
SERVICE,

        Defendants.

Civil Action No. 22-7360 (RK) (TJB)

**OPINION**

**KIRSCH, District Judge**

    This matter comes before the Court upon the parties' cross-motions for summary judgment on Plaintiffs' challenge to the National Marine Fisheries Service's ("NMFS") promulgation of a final rule that altered the allocation of three species of fish—summer flounder, scup, and black sea bass—between the recreational and commercial sectors (the "Challenged Rule"), 87 Fed. Reg. 68,925 (Nov. 17, 2022). Plaintiffs, two fishermen who allege harm from the reallocation, object to the constitutional composition of the Mid-Atlantic Fishery Management Council (the "Mid-Atlantic Council"), the federal body that proposed the Challenged Rule and the Fishery Management Plan ("FMP") it implemented. Plaintiffs contend that the twenty-one members of the Mid-Atlantic Council (the "Councilmembers") exercise the power of, but were not properly appointed as, "Officers" under the Appointments Clause of the United States Constitution.

Therefore, Plaintiffs conclude, NMFS should not have promulgated the Challenged Rule and it must be vacated and its enforcement against Plaintiffs enjoined.

Plaintiffs' Complaint levels a single claim for relief, bringing an Appointments Clause challenge to the Challenged Rule. (ECF No. 1.) On April 21, 2023, Plaintiffs—Raymond Lofstad and Gus Lovgren—filed their Motion for Summary Judgment. (ECF No. 33.) On June 1, 2023, Defendants—Gina Raimondo, the Secretary of the United States Department of Commerce, Janet Coit, the Assistant Administrator of the NMFS, and the NMFS itself ("Defendants")—filed a Cross-Motion for Summary Judgment that doubled as its opposition brief to Plaintiffs' Motion, (ECF No. 36), as well as a Motion to Exclude Extra-Record Evidence, (ECF No. 35). On June 29, 2023, Plaintiffs filed a Motion to Expedite Proceedings. (ECF No. 40.)

The parties have disclaimed the need for discovery in the matter and agreed for the Court to proceed based on the administrative record below. (ECF No. 25.) The Court has considered the parties' submissions and resolves the matter without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1.[1] As set forth in detail below, the Court finds that Plaintiffs have established standing to bring their Appointments Clause challenge but that the Mid-Atlantic Council is not constitutionally defective because the Councilmembers are not and do not need to be "Officers" under the Appointments Clause. Therefore, Plaintiffs' Motion for Summary Judgment is **DENIED** and the United States's Motion Cross-Motion for Summary Judgment is **GRANTED**.[2]

---

[1] Neither party requested oral argument on the matter. (ECF Nos. 33, 36.)

[2] Further, Defendants' Motion to Exclude Extra-Record Evidence is **GRANTED** and Plaintiffs' Motion to Expedite Proceedings is **GRANTED**.

## I.   **BACKGROUND**

### A.   THE MAGNUSON-STEVENS ACT

In 1976, Congress enacted the Fishery Conservation and Management Act, Pub. L. No. 94–265, 90 Stat. 331 (1976), later renamed the Magnuson-Stevens Act (the "MSA"), Pub. L. No. 96–561 § 238, 94 Stat. 3275 (1980), in order to establish a comprehensive, national approach to managing the fisheries within the jurisdictional waters of the United States. *See* 16 U.S.C. § 1801.[3] Congress recognized the "valuable and renewable natural resources" the fisheries constituted, the dangers of overfishing, and the economic significance of the coastal fisheries to the United States. *See id.* § 1801(a)(1)–(3). In order to create a "national program for the conservation and management of the fishery resources of the United States," *id.* § 1801(a)(6), Congress set up a federal decisionmaking structure to make rules regulating the fisheries and laid out the broad principles that would guide their management, *id.* §§ 1851–1856.

The MSA vests primary responsibility for managing the nation's fisheries with the Secretary of Commerce (the "Secretary"):

> The Secretary shall have general responsibility to carry out any fishery management plan or amendment approved or prepared by him, in accordance with the provisions of this chapter. The Secretary may promulgate such regulations, in accordance with section 553 of Title 5, as may be necessary to discharge such responsibility or to carry out any other provision of this chapter.

*Id.* § 1855(d). The parties agree that the NMFS exercises the Secretary's authority under the MSA for the relevant purposes of this suit. (ECF No. 33-1 at 7; ECF No. 36-1 at 3.)[4]

---

[3] A "fishery" is defined as "one or more stocks of fish which can be treated as a unit for purposes of conservation and management and which are identified on the basis of geographical, scientific, technical, recreational, and economic characteristics," and "any fishing for such stocks." 16 U.S.C. § 1802(13).

[4] *See also* 16 U.S.C. § 1802(39) ("The term 'Secretary' means the Secretary of Commerce or his designee."); *United Cook Inlet Drift Ass'n v. Nat'l Marine Fisheries Serv.*, No. 21-247, 2022 WL 2222879, at *2 (D. Alaska June 21, 2022) ("The Magnuson-Stevens Act delegates fishery management authority and responsibility to [the National Oceanic and Atmospheric Administration ("NOAA")], an agency within the

To assist the Secretary in managing the nation's fisheries, the MSA also established eight Regional Fishery Management Councils (the "Councils").[5] Each Council has authority over a specific geographic region and is composed of federal officials, state officials, and individuals with relevant expertise or experience appointed by the Secretary. 16 U.S.C. § 1852. Each Council is commanded to "exercise sound judgment in the stewardship of fishery resources" by monitoring their respective fisheries and gathering input from "the States, the fishing industry, consumer and environmental organizations" in order to propose management plans for the Secretary's approval. *Id.* § 1801(b)(5).

### 1.    Creation of Fishery Management Plans

The MSA's overarching design for fishery management is implemented through Fishery Management Plans ("FMPs"). An FMP sets out the "conservation and management measures" that are "necessary and appropriate for the conservation and management of the fishery, to prevent overfishing and rebuild overfished stocks, and to protect, restore, and promote the long-term health and stability of the fishery." *Id.* § 1853(a)(1). The MSA sets out a list of detailed requirements each FMP must comply with, *id.* § 1853(a)(1)–(15), as well as provisions the FMP may contain, *id.* § 1853(b)(1)–(14). The mandatory requirements include technical assessments and specifications of the fisheries and their expected uses, and the data relied on in the FMP's formulation, among others. *Id.* § 1853(a)(2)–(4). Any FMP or amendment must also be consistent

---

Department of Commerce, and NOAA, in turn, has delegated some of its authority and responsibility to NMFS, an agency within NOAA."); *United Boatmen v. Locke*, No. 09-5628, 2011 WL 765950, at *1 (D.N.J. Feb. 25, 2011) (recognizing that the Secretary "act[s] through" the NMFS under the MSA).

Because the parties do not contest the NMFS's ability to act on the Secretary's behalf in promulgating the Challenged Rule, for simplicity the Court refers to the decisionmaker involved in promulgating the Challenged Rule as the Secretary, even though her authority was largely exercised by the NMFS here.

[5] The Court refers generally to the eight Regional Fishery Management Councils established under the MSA as "the Councils" while referring to the specific Mid-Atlantic Fishery Management Council whose decision is challenged in this suit as the "Mid-Atlantic Council."

with a set of ten broadly-written national standards for fishery conservation and management, *id.*

§ 1853(a)(1)(C), reproduced in full below:

(1) Conservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry.

(2) Conservation and management measures shall be based upon the best scientific information available.

(3) To the extent practicable, an individual stock of fish shall be managed as a unit throughout its range, and interrelated stocks of fish shall be managed as a unit or in close coordination.

(4) Conservation and management measures shall not discriminate between residents of different States. If it becomes necessary to allocate or assign fishing privileges among various United States fishermen, such allocation shall be (A) fair and equitable to all such fishermen; (B) reasonably calculated to promote conservation; and (C) carried out in such manner that no particular individual, corporation, or other entity acquires an excessive share of such privileges.

(5) Conservation and management measures shall, where practicable, consider efficiency in the utilization of fishery resources; except that no such measure shall have economic allocation as its sole purpose.

(6) Conservation and management measures shall take into account and allow for variations among, and contingencies in, fisheries, fishery resources, and catches.

(7) Conservation and management measures shall, where practicable, minimize costs and avoid unnecessary duplication.

(8) Conservation and management measures shall, consistent with the conservation requirements of this chapter (including the prevention of overfishing and rebuilding of overfished stocks), take into account the importance of fishery resources to fishing communities by utilizing economic and social data that meet the requirements of paragraph (2), in order to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities.

(9) Conservation and management measures shall, to the extent practicable, (A) minimize bycatch and (B) to the extent bycatch cannot be avoided, minimize the mortality of such bycatch.

(10) Conservation and management measures shall, to the extent practicable, promote the safety of human life at sea.

*Id.* § 1851(a). By requiring consistency with the national standards, the MSA ensures that each FMP conserves the fisheries' resources, maintains an "optimum yield" from each fishery, and promotes commercial and recreational fishing. *Id.* § 1801(b)(1)–(4).

The Councils have primary responsibility for preparing and proposing FMPs and amendments—consistent with the FMP requirements set out in section 1853 and the national standards stated in section 1851—to the Secretary for her review. *See id.* § 1852(h)(1). When the Council prepares a proposed FMP or amendment, the Secretary reviews it "to determine whether it is consistent with the national standards, the other provisions of this chapter, and any other applicable law." *Id.* § 1854(a)(1)(A). The Secretary must also initiate a notice and comment period for the proposed FMP or amendment. *Id.* § 1854(a)(1)(B). Within 30 days of close of the public comment period, the Secretary must "approve, disapprove, or partially approve a plan or amendment . . . by written notice to the Council." *Id.* § 1854(a)(3). If the Secretary disapproves, she must issue a written statement specifying how the FMP is inconsistent with the law and propose a way for the FMP to be changed. *Id.* The Council then may submit a revised FMP to the Secretary, re-initiating the notice and comment period. *Id.* § 1854(a)(4). If the Secretary declines to approve or disapprove of the FMP proposal within the 30-day window, the FMP or amendment becomes effective. *Id.* § 1854(a)(3).

The Secretary, on her own, may prepare an FMP or "necessary amendment" if the Council does not propose one or, after the Secretary disapproves the Council's FMP or amendment, the Council fails to submit a revised one. *Id.* § 1854(c)(1). As the Council must when it develops an FMP, the Secretary must conduct public hearings to permit public input. *Id.* § 1854(c)(2)(A). The Secretary must also submit the FMP or amendment to the relevant Council "for consideration and comment" and open a 60-day notice and comment period. *Id.* § 1854(c)(4). At the end of the 60-

day period, the Secretary may adopt her own FMP or amendment after considering the Council's input and public's comments. *Id.* § 1854(c)(5).

### 2.    Creation of Regulations

FMPs are not enforceable without implementing regulations. *See id.* § 1853(c) (stating that regulations may be "necessary or appropriate" to implement an FMP); *see also N. Carolina Fisheries Ass'n, Inc. v. Gutierrez*, 550 F.3d 16, 17 (D.C. Cir. 2008) ("[FMPs], however, do not themselves have any regulatory effect—implementing regulations must also be enacted in order to effectuate them."). As with the creation of FMPs, implementing regulations may originate with either the relevant Council or the Secretary.

If the Council deems that regulations would be "necessary or appropriate" to implement an FMP or amendment, the Council must submit proposed regulations to the Secretary simultaneously with its proposed FMP or amendment. 16 U.S.C. § 1853(c)(1).[6] Upon receiving the Council's proposed regulations, the Secretary must immediately evaluate them "to determine whether they are consistent with the fishery management plan, plan amendment, this chapter and other applicable law." *Id.* § 1854(b)(1). If the Secretary approves, she must initiate a notice-and-comment period on the proposed regulation. *Id.* § 1854(b)(1)(A). If the Secretary finds the proposed regulations are inconsistent with the above standards, she must notify the Council in writing and propose revised regulations. *Id.* § 1854(b)(1)(B). Once the Secretary approves the proposed regulations, she must "promulgate final regulations within 30 days after the end of the comment period." *Id.* § 1854(b)(3).

---

[6] The Council may also propose regulations apart from its proposed FMP or amendment under certain circumstances. *Id.* § 1853(c)(2).

The Secretary may also originate FMP-implementing regulations. *Id.* § 1854(c)(6) ("The Secretary may propose regulations in the Federal Register to implement any plan or amendment prepared by the Secretary."). The Secretary must submit the planned regulations to the Council and open a comment period for 60 days. *Id.* As with Council-proposed regulations, within 30 days after the comment period ends, the Secretary must issue the final regulations. *Id.* § 1854(c)(7).

### 3.      The Mid-Atlantic Fishery Management Council

Each of the eight Councils is "granted authority over a specific geographic region and is composed of members who represent the interests of the states included in that region." *C & W Fish Co. v. Fox, Jr.*, 931 F.2d 1556, 1557–58 (D.C. Cir. 1991) (citing 16 U.S.C. § 1852); *see also* 16 U.S.C. § 1852(a)(2) ("Each Council shall reflect the expertise and interest of the several constituent States in the ocean area over which such Council is granted authority."). The Mid-Atlantic Council has authority over the fisheries of the Atlantic Ocean seaward of New York, New Jersey, Delaware, Pennsylvania, Maryland, Virginia, and North Carolina. *Id.* § 1852(a)(1)(B).

The MSA specifies the number and manner of appointment for each Council's voting members. Of the twenty-one voting members of the Mid-Atlantic Council, seven are the "official[s] with marine fishery management responsibility and expertise" in each state as designated by the state governors, *id.* § 1852(b)(1)(A); one is the NMFS's regional administrator for the Mid-Atlantic region, *id.* § 1852(b)(1)(B); and thirteen are selected by the Secretary from slates nominated by the state governors, *id.* § 1852(a)(1)(C).

The thirteen Secretary-appointed members "must be individuals who, by reason of their occupational or other experience, scientific expertise, or training, are knowledgeable regarding the conservation and management, or the commercial or recreational harvest, of the fishery resources of the geographical area concerned." *Id.* § 1852(b)(2)(A). State governors submit a list of

individuals who meet these criteria to the Secretary, who then chooses the Councilmembers. *Id.* § 1852(b)(2)(C). The Secretary may notify the Governor if an individual is "not qualified," at which point the Governor must submit a revised list or defend the qualifications of her candidate. *Id.* In making appointments, the Secretary must attempt to "ensure a fair and balanced apportionment" of Councilmembers representing the "commercial and recreational fisheries under the jurisdiction of the Council." *Id.* § 1852(b)(2)(B).[7]

### 4. States' Role in Fishery Management

The states also play a role in managing the waters within the Mid-Atlantic Council's geographical region. Federal rules promulgated under the MSA apply to the United States's "exclusive economic zone" ("EEZ") which extends from 3 to 200 miles from the country's coast.[8] Congress enacted the Atlantic Coastal Fisheries Cooperative Management Act of 1993, 16 U.S.C. §§ 5101 *et seq.*, to coordinate interstate conservation of fishery resources that spanned federal and multiple states' territorial jurisdiction. The statute recognized the Atlantic States Marine Fisheries Commission (the "Atlantic Commission"), which had already existed via congressionally approved interstate compact. *Id.* § 5102(3). The Atlantic Commission's authority is limited to creating coastal fishery management plans that cover any stock of fish that "moves among, or is broadly distributed across, waters under the jurisdiction of two or more States or waters under the jurisdiction of one or more States and the exclusive economic zone." *Id.* § 5102(2); *id.* § 5104(a)(1)

---

[7] The Secretary-appointed members serve three-year terms, except that the Secretary may designate a shorter term "if necessary to provide for balanced expiration to terms of office." *Id.* § 1852(b)(3). Councilmembers are limited to three consecutive terms. *Id.* The Secretary may remove councilmembers "for cause" if either the Council first recommends removal by two-thirds vote or the Secretary finds that the councilmember failed to disclose a financial interest required by the MSA. *Id.* § 1852(b)(6).

[8] *See* 16 U.S.C. § 1802(11) ("The term 'exclusive economic zone' means the zone established by [Proclamation 5030]. . . . [T]he inner boundary of that zone is a line coterminous with the seaward boundary of each of the coastal States."); Proclamation 5030, 48 Fed. Reg. 10,605, 10,605 (Mar. 10, 1983); 43 U.S.C. § 1312; 16 U.S.C. § 1856(a).

("The [Atlantic] Commission shall prepare and adopt coastal fishery management plans to provide for the conservation of coastal fishery resources."). Where the Atlantic Commission's plan covers a fishery located in federal waters, it must "complement" the FMPs covering those waters. *Id.* § 5104(a)(1).

## B.    AMENDMENT 22

On November 17, 2022, the Secretary promulgated the Challenged Rule, which implemented Amendment 22 to the Summer Flounder, Scup, and Black Sea Bass Fishery Management Plan ("Amendment 22"). 87 Fed. Reg. 68,925 (Nov. 17, 2022) (to be codified at 50 C.F.R. pt. 648). Prior to the Challenge Rule's enactment, the allocation between commercial and recreational fishing sectors for those three species—summer flounder, scup, and black sea bass—was set in the mid-1990s based on historical proportions of catch or landings for each species. 87 Fed. Reg. at 68,926. Updated data received in 2018 and 2019 altered the estimated numbers of fish available and "created a mismatch between the data that were used to set the allocations and the data currently used in fishery management for setting catch limits." 87 Fed. Reg. at 68,926.

In response, the Mid-Atlantic Council and the Atlantic Commission approved Amendment 22 to the Summer Flounder, Scup, and Black Sea Bass Fishery Management Plan in December 2021. 87 Fed. Reg. at 68,926. The Council transmitted Amendment 22, along with proposed implementing regulations, to the Secretary, who published a notice of availability for public comment in the Federal Register. *See* 87 Fed. Reg. 49,573 (Aug. 11, 2022); 87 Fed. Reg. 49,796 (Aug. 12, 2022). The Secretary considered the public comments received and Amendment 22 itself and approved Amendment 22 on November 7, 2022. 87 Fed. Reg. at 68,926. The Challenged Rule implementing Amendment 22 was promulgated on November 17, 2022. 87 Fed. Reg. at 68,925.

The Challenged Rule's change for the three fish species "result[s] in a shift in allocation from the commercial to the recreational sector." 87 Fed. Reg. at 68,926.

The Challenged Rule "implement[ed] changes to the commercial and recreational allocations for summer flounder, scup, and black sea bass." 87 Fed. Reg. at 68,926. The Challenged Rule's reduced the commercial allocation of summer flounder from 60 to 55 percent, the commercial allocation of scup from 78 to 65 percent, and the commercial allocation of black sea bass from 49 to 45 percent. *Compare* 87 Fed. Reg. at 68,926 (listing the approved new commercial allocations for the three species), *with* 87 Fed. Reg. at 49,574 (listing the then-existing commercial allocations for the three species).

## C.    LOFSTAD AND LOVGREN

Plaintiffs are two commercial fishermen operating in the federal waters off the coast of the Mid-Atlantic states who allege harm from the Challenged Rule's re-allocation of black sea bass, summer flounder, and scup. Raymond Lofstad ("Lofstad") has been a commercial fisherman in New York since 1997, has owned his own boat since 1992, and possesses permits to land his federal catch in New York. (ECF No. 33-5 ¶¶ 16–17.) Approximately 50 percent of Lofstad's catch occurs in federal waters of the Mid-Atlantic, and of that amount, 40 to 60 percent consists of summer flounder, scup, and black sea bass. (*Id.* ¶ 18.) Gus Lovgren ("Lovgren") has fished in federal waters for nineteen years and operated a fishing vessel for the past three years. (*Id.* ¶¶ 19–20.) Approximately 90 percent of Lovgren's catch occurs in federal waters of the Mid-Atlantic, and of that amount, 60 to 80 percent consists of summer flounder, scup, and black sea bass. (*Id.* ¶ 21.) Plaintiffs rely heavily on their catches of summer flounder and black sea bass for income, "consistently catching those species up to or near the catch limits imposed on them." (*Id.* ¶¶ 22–23.) Plaintiffs predict that re-allocating fish away from them will result in "reducing [their] trip

limits, reducing landing limits, [and] causing earlier or more frequent seasonal closures." (*Id.* ¶ 24.) Lofstad predicts a resulting annual loss of between $15,000 and $30,000 gross revenue and Lovgren predicts an annual loss of between $75,000 and $100,000 gross revenue because of the Rule's re-allocation from commercial to recreational fishermen. (*Id.* ¶¶ 35–36.)

### D.   PROCEDURAL HISTORY

Plaintiffs filed suit on December 16, 2022. (ECF No. 1.) The Complaint challenges the Secretary's promulgation of the Challenged Rule, contending that the Challenged Rule's "reallocation of [black sea bass, summer flounder, and scup] must be set aside because it was adopted by the Council, whose structure violates the Constitution's Appointments Clause." (*Id.* ¶¶ 1, 6.) Plaintiffs argue that the Councilmembers exercise the power of federal "Officers" and therefore must be appointed in conformity with the Appointments Clause. (*Id.* ¶¶ 71–86.) Plaintiffs conclude that the Secretary's promulgation of the Challenged Rule proposed by unconstitutionally appointed Councilmembers was "contrary to constitutional right, power, privilege, or immunity" under 5 U.S.C. § 706(2)(B) and seek judgment declaring the Challenged Rule's allocations void and enjoining Defendants from enforcing the allocations set by the Challenged Rule. (*Id.* ¶ 86; *id.* at *27.)[9]

The parties stipulated that the matter will be adjudicated by cross-motions for summary judgment, agreed that no discovery is needed, and set forth a proposed briefing schedule. (ECF No. 25.) Plaintiffs filed the administrative record "of the development, approval, and implementation of Amendment 22 to the Summer Flounder, Scup, and Black Sea Bass Fishery Management Plan" on February 27, 2023. (*See* ECF Nos. 12–18.) Pursuant to the parties' proposed

---

[9] Pin-cites in citations to the Complaint preceded by an asterisk refer to the page numbers of the document rather than the paragraph numbers.

plan, Defendants submitted two supplements to the administrative record at Plaintiffs' request. (*See* ECF Nos. 26–29, 32.)

Plaintiffs filed their pending Motion for Summary Judgment on April 21, 2023. (ECF No. 33.)[10] Their Motion was accompanied by a brief, (ECF No. 33-1), declarations from Plaintiffs, (ECF Nos. 33-2, 33-3), and a brief Statement of Facts, (ECF No. 33-5). On June 1, 2023, Defendants filed their Cross-Motion for Summary Judgment. (ECF No. 36.) Their Motion was accompanied by a combined brief supporting their Motion and opposing Plaintiffs', (ECF No. 36-1), their Response to Plaintiffs' Statement of Facts, (ECF No. 36-3), and their Supplemental Statement of Facts, (ECF No. 36-4). Plaintiffs filed a joint reply and opposition brief on June 29, 2023, (ECF No. 39), along with a Response to Defendants' Supplemental Statement of Facts, (ECF No. 39-1). Defendants filed a reply brief on July 27, 2023. (ECF No. 42.)

On June 1, 2023, Defendants also filed a Motion to Exclude Extra-Record Evidence, seeking to exclude references in Plaintiffs' moving brief to an "Oral History Interview" of Sam Rauch, the Deputy Assistant Administrator for Regulatory Programs, National Oceanic and Atmospheric Administration Fisheries. (ECF No. 35.) Defendants filed a moving brief, (ECF No. 35-1), Plaintiff filed an opposition brief, (ECF No. 37), and Defendants filed a reply brief, (ECF No. 38). On June 29, 2023, Plaintiffs filed an unopposed Motion to Expedite Proceedings pursuant to 16 U.S.C. § 1855(f)(4). (ECF No. 40.)[11]

---

[10] On May 15, 2023, the matter was transferred to the Undersigned. (ECF No. 34.)

[11] The MSA instructs a reviewing court on a plaintiff's motion to "assign the matter for hearing at the earliest possible date and shall expedite the matter in every possible way." 16 U.S.C. § 1855(f)(4). Plaintiff's Motion to Expedite is **GRANTED**.

## II.   **LEGAL STANDARD**

Regulations promulgated under the MSA are subject to judicial review under the standards and procedures set out in the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 701 *et seq.* 16 U.S.C. § 1855(f)(1). Regulations may only be set aside on certain grounds specified under the APA. *Id.* § 1855(f)(1)(B) (permitting review pursuant to 5 U.S.C. § 706(2)(A)–(D)). The APA, as incorporated by the MSA, requires a reviewing court to:

> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
>
> > (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
> >
> > (B) contrary to constitutional right, power, privilege, or immunity;
> >
> > (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
> >
> > (D) without observance of procedure required by law . . .

5 U.S.C. § 706. To the extent the court is presented with a disputed fact in deciding an APA challenge to an agency regulation, the court applies the familiar summary judgment standard.[12] Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material fact" is one that "might affect the outcome of the suit under the governing law . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine dispute" about a fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* The Court must "view[] the facts in the light most favorable to the [non-moving] party." *Marino*

---

[12] As noted above, *see* Section I.D, *supra*, the parties did not seek discovery in this matter and requested the Court decide their cross-motions for summary judgment based on the administrative record. (ECF No. 25.) Therefore, as shown below, there is evidently no dispute over material facts necessary to decide this matter.

*v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

## III.   DISCUSSION

The Court's analysis begins by determining whether Plaintiffs have Article III standing to challenge the Councilmembers' manner of appointment before proceeding to the merits of Plaintiffs' Appointments Clause challenge. For the reasons stated herein, the Court finds that Plaintiffs' have standing to sue but that the Councilmembers are not "Officers" under the Appointments Clause. Therefore, Plaintiffs' challenge fails.

### A.   ARTICLE III STANDING

Article III of the Constitution "limits the jurisdiction of federal courts to 'Cases' and 'Controversies.'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559 (1992); *see also* U.S. Const. art. III, § 2, cl. 1. The standing doctrine "serves to identify those disputes which are appropriately resolved through the judicial process." *Whitmore v. Arkansas*, 495 U.S. 149, 154–55 (1990) (citation omitted). Ensuring a plaintiff's Article III standing before reaching the merits of their claim respects the separation of powers embodied in the Constitution. *See Lujan*, 504 U.S. at 559–60; *see also Raines v. Byrd*, 521 U.S. 811, 818 (1997) ("No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." (citation omitted)).

The Supreme Court recognizes three elements constituting the "irreducible constitutional minimum" for establishing a plaintiff's standing. *Lujan*, 504 U.S. at 560. *First*, the plaintiff must have suffered an "injury in fact," *i.e.* "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Id.* (citations and quotation marks omitted). *Second*, there must be a "causal connection between the

injury and the conduct complained of," such that the injury is "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Id.* at 560–61 (cleaned up) (citing *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976)). *Third*, "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Id.* at 561 (citing *Simon*, 426 U.S. at 38, 43).

"The party invoking federal jurisdiction bears the burden of establishing these elements." *Id.* (citations omitted). To establish standing in response to a challenge at summary judgment, the plaintiff must "'set forth' by affidavit or other evidence 'specific facts,' which for purposes of the summary judgment motion will be taken to be true." *Id.* (quoting Fed. R. Civ. P. 56(e)). In evaluating standing, the court is careful to confine itself to analyzing the elements of standing and not prematurely reach the merits of the parties' disputes. *See Cottrell v. Alcon Lab'ys*, 874 F.3d 154, 162–63 (3d Cir. 2017) (noting that a court deciding standing must "separate [its] standing inquiry from any assessment of the merits of the plaintiff's claim" by "assum[ing] for the purposes of [its] standing inquiry that a plaintiff has stated valid legal claims").[13] However, the Supreme Court has instructed that a court's standing inquiry should be "especially rigorous when reaching the merits of the dispute would force [it] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Raines*, 521 U.S. at 819.[14]

---

[13] The Third Circuit in *Cottrell* continued in the same vein, warning against "improperly, if inadvertently, crossing over in [its] analysis from standing to merits." 874 F.3d at 163. "Although standing and merits questions may involve overlapping facts, standing is generally an inquiry about the plaintiff: is this the right person to bring this claim." *Williamsport Hosp. v. Sec'y, United States Dep't of Health & Hum. Servs.*, 761 F. App'x 91, 95 (3d Cir. 2019) (quoting *Davis v. Wells Fargo*, 824 F.3d 333, 348 (3d Cir. 2016)).

[14] Plaintiffs' standing arguments cite extensively to the Third Circuit's recent decision in *Cirko ex rel. Cirko v. Comm'r of Soc. Sec.*, 948 F.3d 148 (3d Cir. 2020). However, *Cirko* is inapplicable because the *Cirko* panel considered whether the plaintiffs' failure to raise their constitutional challenge at the agency level precluded judicial review. *Id.* at 153. The exhaustion requirement is imposed as "a matter of sound judicial discretion," *id.* at 153 (citation omitted), while Article III standing requirements constitute an "irreducible constitutional minimum," *Lujan*, 504 U.S. at 560. Although the Court is cognizant of the foundational constitution principles at stake in an Appointments Clause challenge as articulated in *Cirko*, Plaintiffs must

###### 1.      Injury-in-Fact

Plaintiffs argue that they have established an Article III injury by the financial losses they have and will suffer from the Challenged Rule's reduction in the amounts of black sea bass, summer flounder, and scup that they are authorized to catch. (ECF No. 33-1 at 14.) Defendants do not contest the fact of Plaintiffs injury, arguing against standing solely based on the causation and redressability prongs of the test. (*See generally* ECF No. 36-1.)

The injury-in-fact requirement serves "to distinguish a person with a direct stake in the outcome of a litigation—even though small—from a person with a mere interest in the problem." *Cottrell*, 874 F.3d at 162 (quoting *United States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 689 n.14 (1973)). The standard is "very generous" to plaintiffs, requiring only evidence of "some specific, identifiable trifle of injury." *Id.* (quoting *Bowman v. Wilson*, 672 F.2d 1145, 1151 (3d Cir. 1982)). A showing of "financial harm will easily satisfy" the injury-in-fact requirement because "financial harm is a 'classic' and 'paradigmatic form[]' of injury in fact." *Id.* at 163 (quoting *Danvers Motor Co. v. Ford Motor Co.*, 432 F.3d 286, 291, 293 (3d Cir. 2005)). Even a "small financial loss" is sufficient to make this showing. *See id.* (citing *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 55 (2d Cir. 2016)).

Plaintiffs have established an injury that is sufficiently "concrete and particularized" as well as "actual or imminent" to establish their Article III standing. *Lujan*, 504 U.S. at 560. Plaintiffs declare that they rely significantly on their catches of summer flounder and black sea bass for income and that they "consistently" catch fish of those two species up to or near the catch limits imposed on them. (ECF No. 33-5 ¶ 22–23.) Plaintiffs attest that the amount of fish they are

---

still satisfy the requirements of constitutional irrespective of the importance of the values served by a constitutional provision.

able to catch—and therefore the amount of money they are able to earn off of their catch—has been proportionately reduced. Lofstad states that the Challenged Rule's re-allocation of catch limits from commercial to recreational fishing will cause him an annual loss of between $15,000 and $30,000, while Lovgren states that his annual loss will amount to between $75,000 and $100,000. (*Id.* ¶¶ 35–36.)[15]

### 2.   Traceability

#### i.   *Relevant Conduct*

Defendants' primary challenge to traceability stems from their contention that Plaintiffs' suit attempts to "directly review" the Council's actions in proposing Amendment 22 and its implementing rule. (ECF No. 36-1 at 15–16.) Under this theory, the fact that only the Challenged Rule—which was promulgated by the Secretary, whose appointment Plaintiffs do not challenge—is binding on Plaintiffs means that Plaintiffs' injury was caused only by the Secretary, and not by the Council at all. Plaintiffs respond that Defendants mischaracterize the nature of Plaintiffs' claims because they are challenging the Secretary's action in considering proposals from unconstitutionally appointed Councilmembers. (ECF No. 39 at 2–3.)

The traceability analysis examines the "causal connection between the injury and the conduct complained of." *Lujan*, 504 U.S. at 560–61 (cleaned up) (citing *Simon*, 426 U.S. at 41–42). As explained above, the "injury" to Plaintiffs is their lost income from the reduced amount of fish they may catch. The Complaint's Claim for Relief section challenges the Secretary's promulgation of the Challenged Rule. As the Complaint states:

---

[15] As part of their causation argument, Defendants contend that to the extent the Rule caused a reduction in the amount of fish available to Plaintiffs, such reduction was "miniscule." (ECF No. 36-1 at 19–20.) Defendants offer no support for the position that a minor injury to a plaintiff is too small and thus not cognizable as an injury-in-fact under Article III's requirement. Indeed, "[a]ny monetary loss suffered by the plaintiff satisfies the injury-in-fact element; even a small financial loss suffices." *Cottrell*, 874 F.3d at 163 (cleaned up) (quoting *Carter*, 822 F.3d at 55).

> Because *the Rule* was proposed by the Council, and its members are unconstitutionally appointed, *the Rule* is contrary to constitutional right, power, privilege, or immunity. 5 U.S.C. § 706(2)(B). *The Rule* is contrary to constitutional right, power, privilege, or immunity as well because it implements Amendment 22, which was formulated by the Council, whose members are unconstitutionally appointed.

(ECF No. 1 ¶ 86 (emphasis added).) The Prayer for Relief likewise states that Plaintiffs seek a declaration that the Challenged Rule is void and an injunction setting aside the fish allocations reflected in the Challenged Rule. (ECF No. 1 at *27.) Based on a plain reading of the Complaint, the Court finds the requisite "causal connection" between the "injury"—the Challenged Rule's reduction of the amount of fish Plaintiffs are able to catch—and the "conduct complained of"— the Secretary's consideration and promulgation of the Challenged Rule put forward by an unconstitutionally constituted body. *Lujan*, 504 U.S. at 560–61.

Defendants' invitation to reframe the Complaint in a way that forecloses standing offers some appeal, but upon further consideration, is unpersuasive. As Defendants argue, the constitutional defect identified in the Complaint is the Councilmembers', not the Secretary's. Defendants accuse Plaintiffs of "conveniently reframing their claim to one in which they say they 'do not directly challenge the Council itself'" as a way to create standing. (ECF No. 42 at 7.) However, in evaluating standing, the Third Circuit instructs that the court must "assume . . . that a plaintiff has stated valid legal claims." *Cottrell*, 874 F.3d at 162–63. Defendants offer no authority that would permit the Court to reframe Plaintiffs' claims in this way. The Complaint's allegations are straightforward: because the Councilmembers were unconstitutionally appointed, when the Council proposed Amendment 22 and the Challenged Rule to the Secretary, the Secretary was obligated to ignore and void the proposals *ab initio*. By promulgating the Challenged Rule notwithstanding, the Secretary's action was "contrary to [Plaintiffs'] constitutional right[s]" and "in excess of [the Secretary's] statutory jurisdiction, authority, or limitations, or short of [the

Secretary's] statutory right." 5 U.S.C. § 706(2)(B)–(C). Therefore, the Court presumes that Plaintiffs' legal theory—under which the Secretary's action was improper by failing to disregard the proposal from an unconstitutionally appointed body—is viable for the purposes of Plaintiffs' standing. In other words, absent authority to the contrary, the Court must assume that Plaintiffs' claim is cognizable under the APA, and thus the Secretary was obligated to ignore a regulation proposed by an unconstitutionally appointed Council.[16]

Defendants rely heavily on a pair of cases out of the Ninth Circuit for their position. In *Nw. Env't Def. Ctr. v. Brennen*, the plaintiffs sued the Secretary and the NMFS, challenging the constitutional composition of the Pacific Fishery Management Council that proposed an FMP and implementing regulations. 958 F.2d 930, 933 (9th Cir. 1992). The Ninth Circuit held that "[w]hatever constitutional infirmity may inhere in the Council's structure has not caused the injury of which NEDC complains." *Id.* at 937. More recently in *United Cook Inlet Drift Ass'n v. Nat'l Marine Fisheries Serv.* (*UCIDA*), a District of Alaska court applied *Brennen* to hold that the plaintiffs lacked standing to challenge the Council's composition under the Appointments Clause in their suit against the Secretary and NMFS (but not the Council). No. 21-247, 2022 WL 2222879, at *18–19 (D. Alaska June 21, 2022. The court examined the MSA's structure and concluded that because the Council's proposed rule had no legal effect absent action by the Secretary, therefore "the Council's composition and the Council's proposal of [the FMP] is not the cause of [the] Plaintiffs' alleged injuries." *Id.* at *19.[17]

---

[16] Defendants contend that there is no support for Plaintiffs' position that "the office whose structure is allegedly defective" can also be "the office that injured the plaintiff" for standing purposes. (ECF No. 42 at 8.) True, Plaintiffs have not offered a case directly on point to this matter. However, absent an articulated principle that would permit the Court to reframe the Complaint as Defendants seek, the Court will take the claims as they are for its standing inquiry.

[17] The Court only addressed the plaintiffs' constitutional challenge after finding for the plaintiffs and concluding that the final rule was arbitrary and capricious and did not comply with the Magnuson-Stevens Act's national standards. *Id.* at *6–17. Although the United States appealed the portion of the district court's

Because neither case is binding on this Court, their persuasiveness turns on the rationales underpinning them. *See United States v. Vasquez-Algarin*, 821 F.3d 467, 474 (3d Cir. 2016) (declining to adopt the reasoning of cases that "offered little by way of explanation for" their holdings). *Brennen*'s brevity in its standing analysis—the relevant discussion consisted of only four sentences—prevents this Court from examining whether *Brennen*'s rationale is consistent with the Supreme Court and Third Circuit standing cases handed down since then. Further, *Brennen* cites no authority for its implied finding that the constitutional deficiency the plaintiffs identify—rather than the rule challenged in the suit—must have caused the plaintiffs' injury. Indeed, as explained above, this appears at odds with the plain instruction of *Lujan*. *Brennen*'s reliance on the fact that the plaintiff did not allege that a differently-composed Council would have proposed a rule to the plaintiffs' liking, 958 F.2d at 937, is undercut by the Supreme Court's more recent instruction that a plaintiff "is not required to prove that the Government's course of conduct would have been different in a 'counterfactual world' in which the Government had acted with constitutional authority," *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2191 (2020). The *UCIDA* decision likewise is silent on the heart of the parties' standing disagreement in this matter—whether the relevant actor's conduct for the causation analysis is the Secretary's or the Council's.[18]

---

finding that the rule was arbitrary and capricious in November 2023, it shortly thereafter voluntarily dismissed the appeal.

[18] The parties also dispute whether *UCIDA*'s conclusion that the Supreme Court's decision in *Collins v. Yellen*, 141 S. Ct. 1761 (2021), did not affect its standing analysis was correct. In *Collins*, the Supreme Court rejected the argument that the plaintiffs' injury could not be traced to the statutory removal restrictions applicable to an agency's director, which were the target of the plaintiffs' constitutional challenge. *Id.* at 1779. The Court wrote that "for purposes of traceability, the relevant inquiry is whether the plaintiffs' injury can be traced to 'allegedly unlawful conduct' of the defendant, not to the provision of law that is challenged." *Id.* (quotation marks and citation omitted). This maps onto the claims here. The Secretary's "allegedly unlawful conduct" is the promulgation of the Challenged Rule, while the "provision of law that is challenged" is the method of appointment of the Council. Read plainly, the Supreme Court

Defendants also rely on *Alaska Factory Trawler Ass'n v. Baldridge*, 831 F.2d 1456 (9th Cir. 1987) to argue that whatever constitutional issues may have inhered in the Council's structure, the Secretary's decision to promulgate the Challenge Rule rendered those issues irrelevant to the Challenged Rule that ultimately bound Plaintiffs. (ECF No. 36-1 at 20.) In *Baldridge*, the plaintiffs complained about "procedural irregularities"—involving off-the-record discussions and input through unofficial channels—that they contended infected the Council's proposed FMP amendment and implementing regulation. 831 F.2d at 1459–60. The Ninth Circuit affirmed the district court's decision that the plaintiffs lacked standing to challenge the regulation based on Council-level issues. *Id.* at 1464. However, the court's review in *Baldridge* was limited to whether the Secretary's action in considering a proposal allegedly plagued by procedural irregularities was arbitrary and capricious under 5 U.S.C. § 706(2)(A), *id.* at 1463, not whether there was an underlying issue with the Council's structure that violated the plaintiffs' rights under 5 U.S.C. § 706(2)(C).

Defendants cite several other cases that they contend support their point that courts may not "directly review Council actions under either the MSA or the APA." (ECF No. 36-1 at 15–17.) However, the Court finds the cited cases factually distinguishable from the narrow, directed challenge to the Secretary's action in promulgating the rule in the case at bar. *J.H. Miles & Co. v. Brown* is inapposite because the challenged action was an internal Council policy, not a final rule. 910 F. Supp. 1138, 1157–59 (E.D. Va. 1995). In *Gulf Restoration Network, Inc. v. Nat'l Marine Fisheries, Serv.*, the challenge was to an FMP, rather than a final Rule, which the court held "does not constitute final agency action without promulgation of the corresponding regulations." 730 F.

---

instructs this Court to consider at this stage whether Defendants' challenged actions played a role in Plaintiffs' harm, not whether the constitutional infirmity lies with Defendants.

Supp. 2d 157, 173 (D.D.C. 2010). *Conservation L. Found. of New England, Inc. v. Franklin* likewise involved a statutory challenge to a consent decree the Secretary entered setting out a timetable for an FMP amendment promulgated by the Secretary. 989 F.2d 54, 59–60 (1st Cir. 1993). In *Anglers Conservation Network v. Pritzker*, the district court rejected a challenge to the Council's and NMFS regional administrator's failure to promulgate a rule, finding no basis for judicial review of the Council's or the regional administrator's failure to take an action under the MSA. 70 F. Supp. 3d 427, 433 (D.D.C. 2014), *aff'd*, 809 F.3d 664 (D.C. Cir. 2016). Finally, *Flaherty v. Ross* also involved a direct challenge to an FMP amendment proposed by a Council covering the Atlantic herring fishery in the northeastern United States, rather than a challenge to a rule promulgated by the Secretary. 373 F. Supp. 3d 97, 99 (D.D.C. 2019). In short, none of these cases involved a challenge to the plaintiffs' standing to sue the Secretary or NMFS over a promulgated rule first proposed by the Council.

ii.      *States' Role*

In addition, Defendants argue that the States' involvement in regulating the fishing industry breaks the casual chain connecting the Challenged Rule from Plaintiffs' harm. (ECF No. 36-1 at 17–20.) Plaintiffs respond that this argument construes the causation requirement too strictly and misunderstands the role states play in regulating Plaintiffs. (ECF No. 39 at 15–21.)

The requirement that a plaintiff's injury be caused by a defendant to a matter, rather than the actions of a third party, is well-established. A plaintiff lacks standing if their injury "results from the independent action of some third party not before the court." *Simon*, 426 U.S. at 42. However, the Supreme Court has cautioned against construing this principle too strictly. *See Bennett v. Spear*, 520 U.S. 154, 170–71 (1997). In *Bennett*, the Fish and Wildlife Service had issued an opinion that a water reclamation project's operation would threaten several endangered

fish species and recommended maintaining certain water levels in two reservoirs overseen by the Bureau of Reclamation. *Id.* at 157–59. The Bureau announced that it intended to comply with the Service's opinion. *Id.* at 159. The petitioners, commercial users' of the reservoirs' water, sued the Service and the Secretary over perceived flaws in the Service's opinion, on which the Bureau had relied in making its decision. *Id.* at 159–60. The defendants argued that the second and third prongs of the Article III standing failed, because even though the Service had recommended injurious action, the Bureau "retains ultimate responsibility for determining whether and how a proposed action shall go forward." *Id.* at 168. The Supreme Court rejected this argument, as it "wrongly equate[d] injury 'fairly traceable' to the defendant with injury as to which the defendant's actions are the very last step in the chain of causation." *Id.* at 168–69. Because the Service's opinion had a "virtually determinative effect" on the Bureau's action, the plaintiffs had adequately alleged a connection between their injuries and the defendants' conduct to establish traceability. *Id.* at 170.

In *Const. Party of Pa. v. Aichele*, the Third Circuit applied *Bennett* to explain that "[c]ausation in the context of standing is not the same as proximate causation from tort law.'" 757 F.3d 347, 366 (3d Cir. 2014) (citing *Bennett*, 520 U.S. at 168–69). The fact that a plaintiff's injury may have multiple causes does not prevent the causation by one from undermining standing for the suit against the other. *See id.* ("Moreover, there is room for concurrent causation in the analysis of standing." (citation omitted)). The Court continued, explaining that "standing exists even though the direct source of injury is a third party" when "the record present[s] substantial evidence of a causal relationship between the government policy and the third-party conduct, leaving little doubt as to causation and likelihood of redress." *Id.* (quoting *Bloomberg L.P. v. CFTC*, 949 F. Supp. 2d 91, 116 (D.D.C. 2013)). The Court concluded that the defendant state

could not "hide behind the behavior of third parties" when the defendant "empower[ed] those third parties to have the pernicious influence" that caused the plaintiffs' harm. *Id.* at 367.

Other Circuit Courts to have applied *Bennett* in standing cases involving third parties' actions have focused on "the degree to which the [government entity's] actions constrained or influenced the decision of the final actor in the chain of causation." *Carver v. City of New York*, 621 F.3d 221, 226–27 (2d Cir. 2010) (citations omitted); *see also Turaani v. Wray*, 988 F.3d 313, 316 (6th Cir. 2021) ("An indirect theory of traceability requires that the government cajole, coerce, command."). Several Ninth Circuit cases articulate *Bennett*'s standard to ask whether an agency action had a "determinative or coercive effect" on the third party's actions, such that the agency's action could be traced to the plaintiff's injury. *See Skyline Wesleyan Church v. Cal. Dep't of Managed Health Care*, 968 F.3d 738, 750 (9th Cir. 2020) (finding that a state agency's directive that insurers not restrict coverage of certain medical procedures in their plan offerings had "determinative or coercive effect" on the insurers' decision to offer plans without those restrictions); *WildEarth Guardians v. United States Forest Serv.*, 70 F.4th 1212, 1217 (9th Cir. 2023) (finding that an agency's action exerts a "determinative or coercive effect" on a third party when the agency had "clear regulatory authority over the third party who more directly caused the plaintiff's injury" or was "an integral participant in a third-party's allegedly harmful action" (quoting *Ctr. for Biological Diversity v. Exp.-Imp. Bank of the United States*, 894 F.3d 1005, 1013 (9th Cir. 2018))). Or, as the Supreme Court articulated more recently, standing is present when the plaintiff's harm "does not rest on mere speculation about the decisions of third parties; it relies instead on the predictable effect of Government action on the decisions of third parties." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019) (citing *Bennett*, 520 U.S. at 169–70).

Here, the Court finds that the Challenged Rule's effect on the states' promulgation of their own rules, which in turn reduced Plaintiffs' catch, resulted from the "predictable effect" of the Challenged Rule on the states and does not break the causal chain between Defendants' actions and Plaintiffs' harm. *Id.* The Challenged Rule "implements changes to the commercial and recreational allocations for summer flounder, scup, and black sea bass" and "result[s] in a shift in allocation from the commercial to the recreational sector." 87 Fed. Reg. 68,925, 68,926 (Nov. 17, 2022). As Defendants point out, (ECF No. 36-1 at 17), taking the overall allocation of scup, black sea bass, and flounder from what the federal rules set, the states are then free to layer their own limitations by setting trip limits, landing limits, and fishing seasons. *See* N.Y. Comp. Codes R. & Regs. tit. 6, § 40.1 (2023); N.J. Admin. Code § 7:25-18.1 (2023). For black sea bass, there is an additional layer of insulation between the Challenged Rule and the regulations that directly restrict Plaintiffs because the states divide up the federally-allocated quotas among themselves through the Atlantic Commission. *See* 50 C.F.R. § 648.142(c). However, while a state may add on its own additional regulations, it may not detract from the federal limits.

Although the states are responsible for creating a second set of regulations layered on top of the federal baseline, the federal regulations are still sufficiently tied to Plaintiffs' harm to show traceability for Article III standing. The causal chain between the Challenged Rule's reduction of the number of fish allocated to commercial fishermen and the states' translation of those limits into reduced trip limits, landing limits, and fishing seasons is clear. For summer flounder, Defendants agree that federal regulations "include a formula for State commercial allocations . . . ." (ECF No. 36-1 (citing 50 C.F.R. § 648.102(c)(1)).) Likewise, the state implementing regulations provide that the State quotas are based off the levels set federally. *See* N.Y. Comp. Codes R. & Regs. tit. 6, § 40.1(l)(1) (2023) ("The total annual harvest of summer flounder . . . is

the amount allocated annually to New York State by [NMFS] and/or the [Atlantic Commission]."). For black sea bass, the federal regulations make clear that the annual allocation is tied to the Challenged Rule's allocation, even though the states decide how to allocate the reduction among themselves. *See* 50 C.F.R. § 648.140(a)(1) ("The commercial and recreational fishing sector [annual catch limits] will be based on the allocations defined in the Summer Flounder, Scup, and Black Sea Bass Fishery Management Plan.").[19]

Defendants' arguments here mirror those made by the plaintiffs and rejected by the Supreme Court in *Bennett*. There, the fact that the third party that actually promulgated the rules that caused the plaintiffs' harm—the Bureau that controlled the reservoirs—was not named in the suit did not matter for Article III causation because the defendant agency's action had a "virtually determinative effect" on the Bureau's decision. *Bennett v. Spear*, 520 U.S. at 170. The causal link between the Challenged Rule and the ultimate reduction of summer flounder and black sea bass Plaintiffs are able to catch, while perhaps intermediated by state regulation translating the Challenged Rule's broad-base reduction into specific rules, is as clear as the Bureau's decision to maintain the reservoirs in response to the Service's decision. In other words, the fact that the third party that actually promulgated the rules that caused Plaintiffs' harm—the states and the Atlantic Commission here, the Bureau in *Bennett*—does not break that causal chain. Although it is conceivably possible that the states *could* write their rules in a way to prevent the federal law's across-the-board cuts from resulting in harm to Plaintiffs, this hypothetical possibility does not break this causal chain.

---

[19] Plaintiffs' arguments in this section relate solely to summer flounder and black sea bass. Defendants note in a footnote to their opposition brief that Plaintiffs do not discuss harm caused by the Rule's regulation of scup, Defendants contend "likely because the commercial fishery has not come close to landing its allocation of this species in the last ten years." (ECF No. 17 n.5.) Plaintiffs' reply brief is silent with respect to scup, and their causation arguments focus solely on summer flounder and black sea bass. (ECF No. at 15–21.) The Court will therefore do the same in its analysis.

### 3.    Redressability

As with traceability, on redressability Defendants argue that any redress from this Court could not remedy the constitutional defect Plaintiffs identify in the Council's structure because Plaintiffs' suit challenges a rule that only became enforceable once the Secretary approved it. (ECF No. 36-1 at 15–16.) Plaintiffs contend that by declaring the Councilmembers to be unconstitutionally appointed and vacating the Challenged Rule they proposed to the Secretary, their harm will be redressed. (ECF No. 39 at 4.)

The Court's analysis on the redressability prong of the analysis largely follows its traceability analysis. When, as here, Plaintiffs seek "legal or equitable relief," the redressability element is met when a favorable opinion would "relieve 'a discrete injury'" to the plaintiffs. *Lutter v. JNESO*, 86 F.4th 111, 128 (3d Cir. 2023) (quoting *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982)). Plaintiffs' injury is loss of income that flows from being unable to catch as many fish as before the Challenged Rule went into effect. The relief sought in the Complaint is a declaration that the Challenged Rule's allocations as void and an injunction against Defendants enforcing the allocations set by the Challenged Rule. (Compl. ¶ 86; *id.* at *27.) If the Court accepts Plaintiffs' theory of the case that the Secretary's action violated the APA, then the injury may be "redressed by a favorable decision"—setting aside the Rule that the Secretary was allegedly not permitted to consider in the first place. *Lujan*, 504 U.S. at 561 (quoting *Simon*, 426 U.S. at 38).

Defendants argue that redressability fails for the additional reason that thirteen (a majority) of the twenty-one members of the Council were appointed by the Secretary, and that therefore even if they are found to be inferior officers, they were constitutionally appointed. (ECF No. 36-1 at 21–22.) Plaintiffs respond that if *any* councilmember was incorrectly appointed, the Court may

not assume for the purposes of its standing analysis that the remainder would have taken the same course of action. (ECF No. 39 at 13–15; *see also* ECF No. 33-1 at 39–40.)

Defendants' position on this point is resolved by the Supreme Court's decision in *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477 (2010). There, the Supreme Court heard an Appointments Clause challenge to the federal Public Company Accounting Board, whose five Board members were appointed by the SEC. *Id.* at 485–86. At the court below, the Board argued that the petitioners lacked standing for their constitutional claim "because no member of the Board has been appointed over the Chairman's objection, and so petitioners' injuries are not fairly traceable to an invalid appointment." *Id.* at 512 n.12. The Supreme Court rejected the argument, writing that it "cannot assume . . . that the Chairman would have made the same appointments acting alone; and petitioners' standing does not require precise proof of what the Board's policies might have been in that counterfactual world." *Id.* (citing *Glidden Co. v. Zdanok*, 370 U.S. 530, 533 (1962) (plurality op.)).

The Supreme Court's reasoning, although contained in a footnote, persuasively addresses Defendants' argument here. In the same way that the government there could not challenge the petitioners' standing by claiming that *some* members of an allegedly unconstitutionally appointed body were properly appointed, Plaintiffs' standing is not undermined by the possibility that *some* Councilmembers were properly appointed.[20]

\* \* \*

The Court finds that Plaintiff has established the three elements required for Article III standing. Ultimately, Defendants' contentions—as to whether the Secretary had the ability to reject

---

[20] Indeed, although Plaintiffs discuss *Free Enterprise Fund* in both of their briefs, (ECF No. 33-1 at 39–40; ECF No. 39 at 14), Defendants do not address the case, or Plaintiffs argument that flows from it, in their briefing. Although the Court independently evaluates the argument, it appears Defendants may agree this is not a strong argument.

the Council's proposal based on a belief that the Council was unconstitutionally appointed or whether the Court has the ability to enter the relief Plaintiffs seek—are merits arguments not properly resolved based on Plaintiffs' standing.

### B.    MOTION TO EXCLUDE EVIDENCE

Before reaching the parties Appointment Clause arguments, the Court must resolve Defendants' Motion to Exclude Evidence. The contested evidence is a transcript of an interview, conducted on June 30, 2016, of Sam Rauch, who at the time served as Deputy Assistant Administrator for regulatory programs of the NMFS ("Rauch Interview").[21] Defendants seek the Court to disregard the Rauch Interview, arguing that under the APA—and by the parties' agreement—the Court's review is limited to the administrative record, of which the Rauch Interview is not a part. (ECF No. 35-1.) Plaintiffs respond that Rauch's opinion is merely a commentator's opinion interpreting a statute, on which courts commonly rely. (ECF No. 37 at 3.)

In a challenge to a rule brought under the APA, the Court's review is limited to evidence included in the administrative record. *See* 5 U.S.C. § 706; *see also Goffney v. Becerra*, 995 F.3d 737, 747–48 (9th Cir. 2021) ("[A] court reviewing an agency's action may examine extra-record evidence only in limited circumstances that are narrowly construed and applied." (quotation marks and citation omitted)). The parties agree on this point. (ECF No. 35-1 at 5; ECF No. 37 at 2.) Prior to filing their cross-motions for summary judgment, Defendants filed the administrative record, (ECF Nos. 12–18), and the parties agreed on a procedure for supplementing the record and handling any disputes that arose over it, (ECF No. 25). Prior to Plaintiffs filing their moving brief,

---

[21] Plaintiffs present the contested evidence as a link to the online transcript of the interview. *See* Ruth Sando, Rauch, Sam: Oral History Interview 15, 19 (June 30, 2016), available at https://voices.nmfs.noaa.gov/sites/default/files/2018-09/rauch_samuel.pdf. In the interview, Rauch is quoted as saying that the Council is a "mini legislative body" that makes "policy-level decisions." *Id.* at 15, 19.

Defendants supplemented the administrative record twice in response to Plaintiffs' requests. (ECF Nos. 26–29, 32.) At no point during this period did Plaintiffs seek to include the Rauch Interview in the administrative record. Thus, absent some other compelling reason, the transcript is not part of the record and may not be considered at this stage.

Plaintiffs offer two explanations for how they "d[o] not rely on the interview as evidence, that is, to demonstrate the truth of any factual proposition." (ECF No. 37 at 2.) Plaintiffs first frame the Rauch Interview as an opinion expressed in a law review article, (*id.* at 3–4), or alternatively, as a "legislative" rather than an "adjudicative" fact, (*id.* at 5). Neither explanation is persuasive.

Courts commonly rely on academic articles for background knowledge on a subject, *see, e.g. Ohio v. Am. Express Co.*, 585 U.S. 529, 534–35 (2018), or legal analysis of a statutory scheme, *Printz v. United States*, 521 U.S. 898, 930 (1997). However, Plaintiffs do not offer the Rauch Interview as an independent, expert analysis of the statutory scheme's allocation of power, as would be found in an academic article. Rather, Plaintiffs offer the transcript—from an interview with a high-ranking administrator of the federal agency Defendant in this suit—for an insider's view of how power is actually exercised. Because the interview offers no discussion of the MSA, it goes beyond an "academic analysis of the Mid-Atlantic Council," (ECF No. 37 at 3), and constitutes a potential piece of factual evidence that falls outside the scope of the Court's APA review.

Rauch's opinions are also not "legislative" facts, which are facts that "have relevance to legal reasoning and the lawmaking process, whether in the formulation of a legal principle or ruling by a judge or court or in the enactment of a legislative body." Fed. R. Evid. 201, advisory committee's note to 1972 amendment. One of the cases Plaintiffs cite ably expands on this definition:

> Legislative facts are useful in certain instances when a court rules
> on the constitutionality of legislative action by providing the
> necessary context to decipher congressional intent and the purpose
> of the statute in question. However, legislative facts are not routinely
> used as a tool of statutory interpretation in instances, such as here,
> where the Court must resolve a statutory conflict in order to
> determine the reasonableness of a final agency action under the
> APA.

*San Luis & Delta Mendota Water Auth. v. U.S. Dep't of the Interior*, 984 F. Supp. 2d 1048, 1062

(E.D. Cal. 2013). The Court's role in deciding the constitutionality of the Councilmembers'

appointment in light of their statutorily-granted authority is a question of statutory interpretation.

The interview does not explain or parse the "legal reasoning and the lawmaking process" but rather

expresses one individuals inside-baseball view on how power is exercised.[22]

Therefore, Defendants' Motion to Exclude is **GRANTED** and the Court will not consider

the Rauch Interview in its Appointments Clause analysis.

### C.   THE APPOINTMENTS CLAUSE

The Appointments Clause stands as "a bulwark against one branch aggrandizing its power

at the expense of another branch, but it is more: it 'preserves another aspect of the Constitution's

structural integrity by preventing the diffusion of the appointment power.'" *Ryder v. United States*,

515 U.S. 177, 182–83 (1995) (quoting *Freytag v. Comm'r*, 501 U.S. 868, 878 (1991)). The

Appointments Clause states in relevant part that the President of the United States:

> shall nominate, and by and with the Advice and Consent of the
> Senate, shall appoint . . . all other Officers of the United States,
> whose Appointments are not herein otherwise provided for, and
> which shall be established by Law: but the Congress may by Law
> vest the Appointment of such inferior Officers, as they think proper,
> in the President alone, in the Courts of Law, or in the Heads of
> Departments.

---

[22] If Defendants knew that Plaintiffs would seek insider-testimony of how power is exercised between the Council and the Secretary, they may well have secured their own opinions to offer the Court before the administrative record closed.

U.S. Const. art. II, § 2, cl. 2. Embedded in the Clause's purpose is "'protec[ting] individual liberty,' and upholding the 'principle of separation of powers.'" *Cirko ex rel. Cirko v. Comm'r of Soc. Sec.*, 948 F.3d 148, 154 (3d Cir. 2020) (quoting *NLRB v. Noel Canning*, 573 U.S. 513, 571 (2014) (Saclia, J., concurring) and *Buckley v. Valeo*, 424 U.S. 1, 121 (1976)).

The Appointments Clause divides actors into officers and non-officers, the latter of which are also referred to merely as employees. *See Lucia v. S.E.C.*, 585 U.S. 237, 244 (2018) (framing the Appointments Clause inquiry as whether the ALJs were "officers" under the Appointments Clause or "simply employees of the Federal Government."). Among officers, the Appointment Clause jurisprudence further distinguishes between so-called "principal" officers—who must be appointed by the President and confirmed by the Senate—and "inferior" officers—whose appointment Congress may vest in "the President alone, in the Courts of Law, or in the Heads of Department." *See United States v. Arthrex, Inc.*, 141 S. Ct. 1970, 1979 (2021) (quoting U.S. Const. art. II, § 2, cl. 2).

Plaintiffs contend that the Councilmembers are officers, not employees, and thus fall within the Appointments Clause's scope. (ECF No. 33-1 at 17–26.) Plaintiffs further argue that whether viewed as principal or inferior officers does not matter because regardless, they were not appointed as either. (*Id.* at 27–36.) Defendants do not contend that the Councilmembers are validly appointed under the Appointments Clause, arguing instead that "because Council members are not officers, the Court need not even reach the question regarding the propriety of their appointment as principal or inferior officers." (ECF No. 42 at 14.) Because the Court finds that the Councilmembers are not officers subject to the Appointments Clause's strictures, it need not examine how the Councilmembers were appointed. *See Lucia*, 585 U.S. at 245 (noting that because the parties did not contest that the challenged federal official was appointed under any method offered by the

33

Appointments Clause, "[t]he only way" for the government to succeed "is to show that those ALJs are not officers at all, but instead non-officer employees").

The Court's analysis in an Appointments Clause challenge requires answering two questions. *Id.* First, do the challenged officials hold a "continuing office established by law," and second, do the individuals exercise "significant authority." *Id.* at 245–48. These constitutional principles apply both to officers who exercise adjudicatory as well as those exercising rulemaking authority. *See Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2191 (2020) (recognizing that the challenged official "wields vast rulemaking, enforcement, and adjudicatory authority over a significant portion of the U. S. economy"); *see also Buckley*, 424 U.S. at 137 (recognizing that challenged officers' powers included "fleshing out the statute rulemaking and advisory opinions"). Here, the Court resolves the matter on the question of whether the Councilmembers wield significant authority and need not consider whether the Councilmembers hold a continuing office.

While the Supreme Court's Appointments Clause jurisprudence guides the Court's analysis, each office challenged under the Appointments Clause must be evaluated on its own merits. The Supreme Court has declined to articulate a particular test for what constitutes "significant authority." *See Lucia*, 585 U.S. at 246 (refusing to "refine or enhance" the significant authority test because its decision in *Freytag*, 501 U.S. at 881 involved officers who were "near-carbon copies" of the challenged officials). As aptly stated by a district court facing a different Appointments Clause challenge, "[a]ll this Court can do is consider those factors identified by the Supreme Court as relevant to the assessment of an officer's status under the Appointments Clause, with the appreciation that none of them are necessarily dispositive . . . ." *Live365, Inc. v. Copyright Royalty Bd.*, 698 F. Supp. 2d 25, 39 (D.D.C. 2010) (citations omitted).

34

The Court begins with the role the Council performs pursuant to statute. Congress vested the Secretary with overarching "general responsibility to carry out" FMPs and their implementing regulations. 16 U.S.C. § 1855(d). To assist the Secretary, Congress established the Councils "to exercise sound judgment in the stewardship of fishery resources through the preparation, monitoring, and revision of [FMPs]." *Id.* § 1801(b)(5). To fulfill this function, the Council "prepare[s] and submit[s] to the Secretary" proposed FMPs and regulations, holds public hearings to receive public input, and conducts research in support of the Secretary's role. *Id.* § 1852(h).

It is indisputable that neither the Council's proposal of an FMP or its proposal of an implementing regulation has any binding effect on anyone. Without an implementing regulation, the FMP can have no effect on Plaintiffs or any private party. *Id.* § 1853(c) (authorizing the Council to propose regulations necessary to effectuate FMPs); *id.* § 1854(b), (c)(6) (authorizing the Secretary to review and promulgate regulations to effectuate FMPs). As the D.C. Circuit summed up in its analysis of the statute, FMPs "do not themselves have any regulatory effect— implementing regulations must also be enacted in order to effectuate them." *N. Carolina Fisheries Ass'n, Inc. v. Gutierrez*, 550 F.3d 16, 17 (D.C. Cir. 2008); *see also Gulf Restoration Network, Inc. v. Nat'l Marine Fisheries, Serv.*, 730 F. Supp. 2d 157, 174 (D.D.C. 2010) ("[N]or does the FMP establish any rights or obligations or create any binding legal consequences. Adoption of implementing regulations is mandatory . . . ."). Even if the FMPs could take effect without action by the Secretary, the FMP by itself would not bind any third party. In short, without the Secretary's subsequent action to implement a regulation, the Council's suggestions or proposals are toothless.

Other Courts to have analyzed the MSA's structure—albeit in considering questions different from the Appointments Clause "substantial authority" question presented here—have similarly found that the Council's proposed regulation binds no third party. *See Anglers*

*Conservation Network v. Pritzker*, 70 F. Supp. 3d 427, 435 (D.D.C. 2014), *aff'd*, 809 F.3d 664 (D.C. Cir. 2016) (holding that the MSA does not permit judicial review of the Council's decision not to propose an FMP amendment because the "Secretary, who does have the power to take legally binding action and whose sole actions are reviewable under [the MSA], never had occasion to act on" the proposed FMP amendment); *Conservation L. Found. of New England, Inc. v. Franklin*, 989 F.2d 54, 60 (1st Cir. 1993) (interpreting a provision of the MSA as permitting the Secretary to develop her own FMP because the Secretary "is ultimately charged with preventing overfishing as mandated by" the national standards); *United Boatmen v. Locke*, No. 09-5628, 2011 WL 765950, at *1 (D.N.J. Feb. 25, 2011) (concluding that only "[f]inal implementing regulations, once promulgated by NMFS, have the force and effect of law"); *J.H. Miles & Co. v. Brown*, 910 F. Supp. 1138, 1159 (E.D. Va. 1995) (noting that the Council "cannot promulgate regulations, and they do not have any independent authority" because "[t]heir role is to assist the Secretary").[23]

Plaintiffs counter that the Council's decisions have "independent effect" because if the Secretary opts not to reject an FMP or amendment, the Council's proposal becomes effective as the FMP. (ECF No. 33-1 at 22–23 (discussing 16 U.S.C. § 1854(a)).) However, this provision of the MSA applies only to proposed FMPs and amendments, and not to the regulations themselves. True, the Council's proposed FMP or amendment may become final absent the Secretary's decision approving or denying it. *See* 16 U.S.C. § 1854(a)(3). However, as noted above, the *FMP or amendment* by itself lacks the force of law. In contrast, the MSA provides no mechanism for

---

[23] As held above, the Court grants the motion to exclude evidence. However, even if it were to consider the Rauch Interview, it would not affect the analysis. The relevant considerations are the statutes, not employees' opinions on how power is exercised. *See Estes v. U.S. Dep't of the Treasury*, 219 F. Supp. 3d 17, 38 (D.D.C. 2016) (dismissing Appointments Clause challenge where the plaintiffs "largely t[ook] issue with the particular *process* [the agency] utilized in arriving at this *particular* agency decision" because in an Appointments Clause challenges the court does not examine "the degree of supervision or reversal authority actually exercised . . . but rather the extent to which relevant statutes or regulations provide for such oversight as a structural matter" (citing *Edmond v. United States*, 520 U.S. 651, 663–64 (1997))).

the Council's proposed *regulation*—which does have the force of law—to become law without the Secretary's explicit action.[24]

The Court finds no support for the position that the Council's proposed *regulations* can take effect absent the Secretary's action. Plaintiffs rely on the MSA's requirement that the Secretary promulgate final regulations within 30 days after the end of the public comment period and that the Secretary "consult with the Council before making any revisions to the proposed regulations." *Id.* § 1854(b)(3). Plaintiffs combine these requirements to argue that the Council theoretically could refuse consultation and thereby prevent the Secretary from making any revision. (ECF No. 33-1 at 23.) However, the requirement to promulgate a rule 30 days after close of the comment period only applies when the Secretary has already approved the proposed regulation—which is what triggers the public comment period in the first place. The 30-day clock is not triggered if the Secretary rejects the proposed regulation and sends it back to the Council, adding further support that the Council lacks "significant authority." Further, the requirement that the Secretary attempt to consult with the Council over proposed changes to the regulations does not mandate that the Secretary wait for an affirmative response from the Council before making a change.[25]

---

[24] Although not discussed in the parties' briefing because the decision was handed down recently, after the briefing in this matter concluded, the Court has reviewed the decision in *Arnesen v. Raimondo*, No. 23-145, 2024 WL 377820 (S.D. Miss. Jan. 31, 2024). There, the district court sustained an Appointments Clause challenge to the Council's structure, finding plaintiffs' analogy to *Lucia* persuasive. *Id.* at *13. However, the Court did not address the fact that the proposal that could take effect without further agency action was an FMP, which itself was binding on no party.

[25] Plaintiffs cite one regulation as an example of a case in which a proposed regulation became effective when the Secretary was unable to consult with the relevant Council about a change to the proposal. (ECF No. 33-1 at 23 (citing Fisheries off West Coast States; Highly Migratory Fisheries; California Drift Gillnet Fishery; Protected Species Hard Caps for the California/Oregon Large-Mesh Drift Gillnet Fishery, 85 Fed. Reg. 7246, 7246 (Feb. 7, 2020)).) However, the regulation at issue there had already been approved by the Secretary for publication. 85 Fed. Reg. at 7247. Further, that rule was only published because of a Court order. As the rule itself summarized:

The scope of the Secretary's review of the Councilmembers proposals does not change this conclusion. By statute, the Secretary reviews proposed FMPs, amendments, and implementing regulations to determine whether they are "consistent with the national standards, the other provisions of this chapter, and any other applicable law." 16 U.S.C. § 1854(a)(1); *see also id.* § 1854(b)(1). Plaintiffs argue that this standard reflects the Council's "exclusive policymaking power" because if the FMP or regulation "would merely contradict NMFS's preferred policy approach, the agency must approve the measure." (ECF No. 33-1 at 17–18.) Defendants contend that the Secretary's review "is not a mechanical or rote exercise" but rather affords the Secretary "wide discretion to determine whether and how to move forward with action proposed by the Council." (ECF No. 36-1 at 29.)

The "national standards" against which the Secretary judges the Council's proposals are quoted in full above, *See* Section I.A.1, *supra* (quoting 16 U.S.C. § 1851(a)). The standards articulate a series of broad topics that encompass a diverse range of conflicting policy considerations. For example, the first standard requires that the FMPs and regulations be crafted to "prevent overfishing" while also continually reaching "the optimum yield" from each fishery. 16 U.S.C. § 1851(a)(1). The determination of what constitutes overfishing and how many fish constitute the "optimum" are not specified and is left to the discretion of the Secretary to assess.

---

> [T]he Court ordered NMFS to publish a final rule for hard caps by February 7, 2020. The order also states that NMFS shall consult with the Pacific Fishery Management Council (Council) before making any revisions to the proposed regulations. Because the Council's next meeting is not until March 2020, NMFS does not have an opportunity to consult with the Council on revisions to the regulations before the Court's deadline. Therefore, NMFS is publishing the hard caps regulations as they were originally proposed, without changes to the regulatory text, in accord with the order.

85 Fed. Reg. at 7247. Therefore, the Secretary was forced to promulgate the regulation without input from the Council not because the Council was able to game the statutory scheme to avoid changes to its proposed regulation, but because the Secretary was bound by court order.

Another standard requires the allocations be made "fair[ly] and equitabl[y]" to different states' fishermen without granting anyone "an excessive share of such privileges." *Id.* § 1851(a)(4). The FMPs must "take into account and allow for variations among, and contingencies in, fisheries, fishery resources, and catches," *id.* § 1851(a)(6), and account for "the importance of fishery resources to fishing communities" and "minimize adverse economic impacts" on them, *id.* § 1851(a)(8).

These deliberately broad parameters offer ample room for the Secretary to make policy decisions and determine whether the proposed FMPs and regulations match the President's policy priorities. The Court disagrees with Plaintiffs that the Secretary's function here is to "merely verif[y] that a measure is lawful before it goes out the door," (ECF No. 33-1 at 20), as this mischaracterizes the nature of the Secretary's review set out in the statute itself. Other Courts reviewing the nature of the Secretary's review have found similarly. *See Oceana, Inc. v. Pritzker*, 24 F. Supp. 3d 49, 68 (D.D.C. 2014) ("The somewhat conflicting nature of these standards shows that Congress delegated to NMFS the discretion to strike an appropriate balance, and that there is no statutory mandate that one National Standard be maximized at the expense of others."); *All. Against Individual Quota Shares v. Brown*, 84 F.3d 343, 350 (9th Cir. 1996) ("Congress required the Secretary to exercise discretion and judgment in balancing among the [MSA's] conflicting national standards."); *Flaherty v. Ross*, 373 F. Supp. 3d 97, 109 (D.D.C. 2019) ("Plaintiffs appear to operate on the assumption that the Secretary's ability to review those proposals is somehow circumscribed and limited to something like an 'abuse-of-discretion' review. Nothing in § 1854 or elsewhere in the MSA prescribes as much.").

The Supreme Court's recent decisions addressing the scope of "significant authority" in cases involving challenges to agency adjudicators are inapposite to the Councilmembers at issue

here. In *Lucia*, the Supreme Court decided an Appointments Clause challenge to SEC administrative law judges ("ALJs") who exercised authority "'comparable to' that of a federal district judge conducting a bench trial" in hearing cases brought by the SEC. 585 U.S. at 242 (quoting *Butz v. Economou*, 438 U.S. 478, 513 (1978)). After the hearing, the ALJ issued a proposed order—including findings of law and fact—which the SEC could review *sua sponte* and which became final if the SEC declined review. *Id.* at 242. In holding that the SEC ALJs exercised significant authority, the Supreme Court found persuasive the fact that the ALJs' proposed order could become final and binding on the litigant without SEC review if the SEC "decide[d] against reviewing an ALJ decision at all," converting the ALJ's decision into the decision of the SEC. *Id.* at 249. Here, in contrast, no action of the Council can become binding on any private party, like Plaintiffs, without the Secretary's explicit, considered approval.

The purpose of the Appointments Clause is not undermined by this outcome. Reserving the exercise of significant federal authority to officers appointed in conformity with the Appointments Clause prevents Congress from "encroach[ing]" on the President's exclusive authority, "assure[s] a higher quality of appointments" by ensuring appointments are made by an actor "less vulnerable to interest-group pressure and personal favoritism," and "ensure[s] public accountability for both the making of a bad appointment and the rejection of a good one." *Edmond v. United States*, 520 U.S. 651, 659–60 (1997). However, where an official does not exercise federal power, these concerns are not implicated. As explained above, the Council, rather than exercising federal authority itself, is a body of individuals who lend their expertise to the Secretary in carrying out her role. This is evidenced by Congress's requirement that the Council "reflect the expertise and interest of the several constituent States in the ocean area over which such Council is granted authority," 16 U.S.C. § 1852(a)(2), as well as the appointment mechanisms for the Mid-

Atlantic Council's twenty-one members that ensure a diversity of interests and experience are incorporated into its proposals to the Secretary, *id.* § 1852(b)(2). The Council is charged with distilling the members' expertise into recommendations for the Secretary, which the Secretary then independently evaluates to determine whether they comply with her and the President's policy objectives. *See also Flaherty*, 373 F. Supp. 3d at 106 ("At its core, the Council is an advisory body."); *J.H. Miles & Co.*, 910 F. Supp. at 1159 ("In general, then, the Councils appear to be designed to function as advisers, *i.e.*, experts in the field who assist the Secretary in his role in managing the fishery."). Thus, because the Council is advisory and does not wield significant federal authority, allowing Congress to set qualifications for the Councilmembers appointment does not "encroach[]" on the President's power or muddy for the public who should face "public accountability" for an unpopular exercise of federal authority. *Edmond*, 520 U.S. at 659–60.

Plaintiffs other arguments do not change this basic conclusion. (ECF No. 33-1 at 20–21.) The fact that the MSA's policy section instructs the Councils to "exercise sound judgment in the stewardship of fishery resources" when preparing FMPs, 16 U.S.C. § 1801(b)(5), speaks to their responsibility, not their exercise of authority. Likewise, the fact that section 1852 specifies which states each Council has "authority" over, *id.* § 1852(a)(1), does not bespeak actual control evidencing "significant authority" but rather makes clear which geographic region each Council can make recommendations for. While Plaintiffs argue that the Council assembles the administrative record that the Council and the Secretary use to create FMPs, amendments, and implementing regulations, (ECF No. 33-1 at 24), nothing in the MSA suggests that the Secretary's review is limited only to the facts assembled by the Council. Unlike the ALJs in *Lucia* and *Freytag* who wielded the "tools of federal trial judges" to "critically shape the administrative record," *Lucia*, 585 U.S. at 248, the Councilmembers here are only one part of the Secretary's information-

gathering apparatus in deciding whether to approve and promulgate an FMP or regulation. Finally, Plaintiffs read section 1854(h), which requires a three-fourths majority of the Council to approve the Secretary's attempt to repeal or revoke an FMP, as evidence of the Council's ability to "block Secretarial action on policy grounds." (ECF No. 33-1 at 25.)[26] However, even if this provision were read to limit the Secretary's ability to entirely revoke an FMP, it cannot be read to limit the Secretary's ability to amend an FMP. *See* 16 U.S.C. § 1854(c)(1).

---

[26] The referenced provisions reads: "The Secretary may repeal or revoke a fishery management plan for a fishery under the authority of a Council only if the Council approves the repeal or revocation by a three-quarters majority of the voting members of the Council." 16 U.S.C. § 1854(h).

IV.    **CONCLUSION**

For the reasons set forth above, Plaintiffs' Motion for Summary Judgment is **DENIED** and Defendants' Cross-Motion for Summary Judgment is **GRANTED**. Furthermore, Defendants' Motion to Exclude Evidence is **GRANTED** and Plaintiffs' Motion to Expedite is **GRANTED**. An appropriate Order accompanies this Opinion.

_____

**ROBERT KIRSCH**
**UNITED STATES DISTRICT JUDGE**

<u>Dated</u>: February 28, 2024